UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

KIRA GODCHAUX-BOUDREAUX   \* CASE NO.: 21-1525

                                        \* SECTION: L

versus                          \* JUDGE ELDEN E. FALLON

                                        \*

                                        \* MAGISTRATE: 3

                                        \* JUDGE DANA M. DOUGLAS

CITY OF NEW ORLEANS       \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

      Rule 30(b)(6) deposition of the CITY OF NEW ORLEANS POLICE DEPARTMENT, through its representative, CAPTAIN PRECIOUS BANKS, taken on THURSDAY, JULY 7, 2022, commencing at 2:39 PM, via videoconference.

                        \* \* \*



EXHIBIT A

Page 6

1  formal disciplinary investigation initiation along
2  with the attachments that I received.
3      Q   And what are the attachments that you
4  received?
5      A   An anonymous complaint, also an email
6  correspondence from Lieutenant Dan Kramer with a
7  complaint that was forwarded to him and another
8  email correspondence that was received through the
9  NOPD PIB email and some of the additional --
10     Q   Now, what were --
11     A   I'm sorry.  Some of the additional
12 attachments in my complaint were duplicate of
13 other things, maybe three copies of the same
14 complaint.  They were included because it was sent
15 to different people, but it was the actual same
16 document.  I included it in the packet.
17     Q   Oh, okay.  I see.
18     A   Yes, ma'am.
19     Q   About how long did you spend on that
20 review?
21     A   Maybe an hour, an hour or two.
22     Q   Did you conduct any additional searches
23 for material that might be relevant?
24     A   No.  I only looked at the material that
25 I was responsible for at the time.

Page 7

1      Q   Okay.  Did you speak with anyone to
2  prepare to answer any questions about the subject
3  areas you are responsible for?
4      A   Yes.
5      Q   Who did you speak with?
6      A   Attorney Elizabeth Robins.
7      Q   Okay.  Did you speak with anyone else?
8  You didn't speak to anyone else about it besides
9  Ms. Robins; is that correct?
10     A   No.
11     Q   Okay.  And I believe this is probably
12 obvious, but are you currently employed?
13     A   Yes, I am.
14     Q   And who is your employer?
15     A   The City of New Orleans, New Orleans
16 Police Department.
17     Q   What is your job title?
18     A   Police captain.
19     Q   How long have you been a police captain?
20     A   What is this -- nine months.
21     Q   So nine months.  What was your position
22 before you became a captain?
23     A   Police Lieutenant.
24     Q   It's my understanding that you had a
25 role in the Police Integrity Bureau; is that

Page 8

1  correct?
2      A   Correct.
3      Q   What was your role in the -- I'll call
4  it the PIB, the Police Integrity Bureau?
5      A   I was an intake unit supervisor.  My
6  unit was a unit that accepted all complaints
7  against employees of the New Orleans Police
8  Department.
9      Q   How long were you the intake unit
10 supervisor?
11     A   Six years.
12     Q   During those six years, would you see
13 every complaint that was made that came through
14 the Bureau?
15     A   Not every complaint, maybe 95 percent of
16 them.
17     Q   Okay.  What's going on with those other
18 5 percent?
19     A   That's either -- they may have come in
20 in my absence while we're training, vacation, or
21 if they were something that -- a specialized unit
22 within the bureau was handling, I would not have
23 seen those complaints.
24     Q   Something like special cases?
25     A   Correct.

Page 9

1      Q   Okay.  Are you aware of an anonymous
2  complaint that was made against Sergeant Stephanie
3  Tallion on August 20th in 1920 --
4      A   Yes.
5      Q   -- I mean -- I'm sorry.  Not 1920.
6      A   '20.
7      Q   Excuse me.  Time travelers.  2020.
8      A   Yes.
9      Q   What was in that complaint?
10     A   It was an allegation of Sergeant Tallion
11 with inappropriate behavior with officer Kira
12 Godchaux.  I believe she goes by Boudreaux now.
13     Q   What was the alleged inappropriate
14 conduct?
15     A   Officer Godchaux-Boudreaux was in the
16 APR unit.  That's the Alternative Police Response
17 Unit.  And in the complaint, it was stated that
18 she was speaking with another employee.  She was
19 bent over a desk, and, I believe, Sergeant Tallion
20 walked behind her and allegedly, I guess, humped
21 her on her backside or something of that sort.
22     Q   How did you receive the complaints?
23     A   The complaint was an anonymous
24 complaint.  The letter was sent to Deputy Chief
25 Arlinda Westbrook and Captain Sabrina Richardson.

Page 10

1  Captain Richardson handed me the complaint to
2  begin the intake process and the preliminary
3  investigation.
4      Q   So there's -- so this was written in a
5  letter that was sent to those two people, and it
6  was sent to you?
7      A   Yes.
8      Q   Did you --
9          MS. ROBINS:  Well, objection.  I think
10         that misstates her testimony.  She said
11         that the letter was to Captain
12         Richardson and one was to Chief Arlinda
13         Westbrook and that Captain Richardson
14         gave her her copy.
15         MS. FANSHIER:  Yeah.  That's what I
16         meant.  Thanks for clarifying.
17  BY MS. FANSHIER:
18      Q   Are there any other individuals
19  mentioned in the complaint?
20      A   There were possible witnesses listed in
21  the complaint.
22      Q   Can you name those individuals?
23      A   It was several.  I believe there was a
24  Ms. Lewis.  I can't remember the first names of
25  neither.  Richard Lewis, Alba Banks (sounds like),

Page 11

1  let's see, Sergeant Laurie.  I'm trying to
2  remember.  I believe a Alexander.  There were
3  several names mentioned.  I think also maybe a
4  Senter, an Officer Senter.  There were several
5  names mentioned who were possible witnesses.  And
6  remember there was actually two -- either two or
7  three different complaints came through during the
8  time of my preliminary investigation so I may be
9  confusing the names with the different letters.
10 But it all corresponds with the same complaint.
11     Q   Two or three letters were brought to
12 your attention during the initial investigation;
13 is that correct?
14     A   Yes.  So there was one letter that came
15 in to Chief Westbrook and Captain Richardson, the
16 first letter which Captain Richardson delivered to
17 me.  And there was another letter that came in
18 also anonymous.  It mirrored the first letter.
19 Maybe one or two things were different with the
20 verbiage.  And there also was an email that was
21 emailed which was also anonymous that we received.
22     Q   Do you know the identity of the sender
23 of the letters and the email?
24     A   No, ma'am.  They were all anonymous.
25     Q   And you did not discover the identity of

Page 12

1  the sender in your investigation?
2      A   Not in my preliminary investigation, no,
3  I did not discover the identity.
4      Q   Did you attempt to discover the
5  identity?
6      A   There was nothing in those letters that
7  would lead you to be able to identify the person.
8      Q   Was there a reason that you didn't
9  pursue discovering the identity of that person
10 further?
11     A   Based upon the content in those
12 complaints, there was nothing that would help me
13 to identify that person.  It gave, basically,
14 third-hand information, as it appeared, to who
15 the, I would say victim would be and who the
16 witnesses would be.  But there was like no phone
17 number or name of anything -- it -- the complaint
18 letter appeared to be almost like locker room
19 talk, hearsay.  And this person was reporting it
20 anonymously.
21     Q   Did you respond to the letter that was
22 sent by email or the email that was sent?
23     A   The email, I can't recall if I did.  I
24 would have sent the email to that person.  And if
25 a response -- if the person replied, it would have

Page 13

1  been included in the packet.  If for some reason I
2  did not send the email to the person who sent the
3  email, the email was included in the intake packet
4  for the investigator to explore because I was not
5  the investigator.  We were just documenting the
6  original complaint.
7      Q   Okay.  Who was the investigator?
8      A   I do not know.  That would have been in
9  another section or bureau.
10     Q   Can you explain that a little more to
11 me?  You just said it would be in another section
12 of the bureau?
13     A   So I am an intake supervisor.  What we
14 do is we document complaints as they come in and
15 we prepare the investigation packet which we only
16 have a certain number of days to do.  Once we
17 complete the preliminary investigation, it is then
18 assigned to another investigator.  That
19 investigator may be within PIB or the investigator
20 may be assigned to another bureau.  But I do not
21 assign those cases.
22     Q   Okay.  So would -- if I described your
23 role as, you led the preliminary investigation of
24 this anonymous complaint, would that be correct?
25     A   Yes.

Page 14

1  Q   Okay. So one of the subject areas that
2  we just discussed in our request for depositions
3  has been referred to as Subject Area 9 in the
4  response which I believe should already be
5  attached here that Ms. Robins brought up as we
6  were getting started, the defendant has provided
7  that you, Captain Banks, can answer questions
8  about any emails NOPD's Public Integrity Bureau
9  received regarding the anonymous complaint of an
10 alleged incident between Sergeant Tallion and
11 plaintiff; is that correct?
12     A   Yes.
13     Q   And that is the subject that you were
14 prepared to discuss?
15     A   Yes.
16     Q   So are there any other emails that the
17 Public Integrity Bureau has received regarding the
18 anonymous complaint besides those included in the
19 intake and preliminary investigation file that you
20 were describing?
21     A   Not to my knowledge.
22     Q   Would you be aware of them without --
23 let me rephrase that for you. If there were
24 emails received by the Bureau about the complaint
25 past the point where you were leading the

Page 15

1  investigation, would you know about them?
2     A   No. Not if they were not sent to me.
3     Q   And would they be -- okay. You also
4  said that the investigator in charge of the
5  invest -- sorry -- investigating the complaint may
6  not have been in the Public Integrity Bureau,
7  correct?
8     A   Correct.
9     Q   So there could be an email sent to an
10 investigator regarding a complaint that wouldn't
11 have anything to do with the Public Integrity
12 Bureau? Just hypothetically that could happen?
13        MS. ROBINS: I didn't understand the
14     question.
15 BY MS. FANSHIER:
16    Q   Well, okay.
17        MS. ROBINS: Let me see if I can clarify
18     a bit as far as what our responses. So
19     the reason -- and this is why we
20     responded to Subject Area No. 9 the way
21     we did was that Captain Banks could
22     testify to any emails that NOPD PIB
23     received regarding the anonymous
24     complaint of the alleged incident
25     between Sergeant Tallion and the

Page 16

1  plaintiff.
2       And as she's mentioned or
3  testified, she's the supervisor of the
4  intake unit. So sometimes things are
5  received by email. She received some
6  things by email. There wouldn't be
7  intake of the actual complaint at a
8  later stage. That's what she's charged
9  with and that's what she's doing. So
10 any emails received about the initial
11 complaint or with the initial complaint
12 or referencing that, would have been
13 part of the intake package.
14       MS. FANSHIER: Okay. So any
15 additional -- let's just stick to the
16 emails. Any additional emails received
17 by -- sorry -- I mean any additional
18 emails outside of the intake procedure
19 related to the investigation would fall
20 under Subject Area No. 10 or which
21 subject areas would those fall under?
22 I'm asking you, Ms. Robins.
23       MS. ROBINS: Right. And so some of the
24 things that you've asked Captain Banks,
25 particularly what happens to the

Page 17

1  investigation after she's done with it,
2  those were answered by Lieutenant John
3  Helou on 6/27. He's a more senior
4  position in the Public Integrity Bureau.
5  And he discussed not only the various
6  stages of the investigation, but how it
7  progressed amongst different people.
8  And he identified those.
9       You were asking before who was the
10 other investigator. And I believe
11 Lieutenant Helou answered those
12 questions because he did address Subject
13 Area No. 10 during his deposition last
14 Monday.
15       MS. FANSHIER: Well, I believe he
16 addressed those questions from his
17 perspective, but I also think it's
18 reasonable to make sure I'm filling in
19 all of the pieces here. And I am trying
20 to identify any emails that exist and
21 who would be aware of them and their
22 location.
23       So I'll just state here then,
24 Subject Area No. 9 that we had
25 identified was communications of any

Page 18

1  type between the plaintiff or anyone on
2  behalf of plaintiff and defendant or
3  anyone on behalf of defendant from 2021
4  to present. So is Captain Banks unable
5  to answer any questions about any
6  communications between those parties
7  besides emails that may have been sent
8  or received by the Public Integrity
9  Bureau?
10  MS. ROBINS: Well, we did discuss this
11  with the judge at the hearing. And we
12  said that the normal communications that
13  the department would use, other than
14  just picking up the phone and talking to
15  somebody, would be emails. And we
16  expressed that a request for emails has
17  to identify a specific person and a time
18  period and have subject areas. So the
19  judge said -- kind of limited that even
20  though there's not something in her
21  order specifically. And that's why we
22  phrased it the way we did because this
23  is what this witness can talk to.
24      I'm not aware of people that the
25  plaintiff or people on her behalf may

Page 19

1  have sent emails to. But I do know,
2  relative to this investigation which is
3  the subject of the lawsuit, that persons
4  in PIB including Lieutenant Helou who's
5  already testified -- I think John Thomas
6  even may have commented on some of these
7  things. And now Captain Banks as the
8  initial investigator can address how the
9  communication was received. Because in
10  this case, the communication which
11  initiated the complaint was a letter.
12  So it's unusual to have letters.
13      So clearly based on the underlying
14  complaint that was received being by
15  letter and as Captain Banks indicated,
16  there were two very similar letters and
17  then an ominous email. And so I
18  presented her to testify because she's
19  aware of letters that were received, who
20  received them, how she came to receive
21  them, and what she did to initiate an
22  investigation based on those letters and
23  a few limited emails.
24  MS. FANSHIER: Okay. So the subject
25  area as it is written in the notice says

Page 20

1  communications of any type between the
2  plaintiff or anyone on behalf of the
3  plaintiff and defendant or anyone on
4  behalf of defendant. And the order from
5  June 1st that limited and narrowed the
6  scope of some of the subject areas in
7  this deposition does not reference any
8  limitations to this subject area.
9  MS. ROBINS: I'm aware that --
10  MS. FANSHIER: Now, I'm aware that you
11  discussed this at the hearing regarding
12  that it's difficult to search for
13  emails, but I'm just clarifying here
14  that --
15  MS. ROBINS: Okay. Well, here's my
16  response, okay. Then that's a subject
17  area -- you're right, the judge in her
18  order didn't narrow that. So if you
19  want to ask a question relative to that
20  subject area, a specific question,
21  because the subject area itself is not a
22  question, ask a question. And if
23  Captain Banks can't answer that, I will
24  attempt to identify someone who can.
25      So go ahead and ask a question that

Page 21

1      you have based on Subject Area 9 as
2      written and either Captain Banks will
3      answer that or I'll have to identify
4      someone else who can answer that.
5      MS. FANSHIER: Okay.
6  BY MS. FANSHIER:
7      Q  Captain Banks, are you aware of any
8  messages sent to the plaintiff by employees of New
9  Orleans Police Department after the complaint was
10  made?
11      A  No, not to my knowledge.
12      Q  Are you aware of any communications
13  between the New Orleans Police Department and
14  the -- sorry. Let me take a moment.
15      MS. ROBINS: Counsel, I'm going to ask
16      that you go back to that first question.
17      You said, "Are you aware of any messages
18      sent to plaintiff by NOPD employees."
19      MS. FANSHIER: Yeah.
20      MS. FANSHIER: Can you identify maybe
21      the NOPD employees that you're referring
22      to?
23      MS. FANSHIER: No. That's why the
24      defendant needs to identify and inform
25      us of the existence of relevant

Page 26

1  A  No.
2  Q  Okay.
3     MS. FANSHIER: I'm just going to take a
4     moment to look at my notes and see if
5     there is anything else before we can
6     finish up with Captain Banks, okay.
7  BY MS. FANSHIER:
8  Q  So did your part of the investigation of
9  the complaint involve interviewing anyone about
10 it?
11 A  Yes. I interviewed three people, three
12 employees.
13 Q  Okay. And who were those employees that
14 you interviewed?
15 A  A Ms. Lewis, a Ms. Banks, and I believe
16 the other one was Alexander.
17 Q  Okay. And are there transcripts or
18 recordings of those interviews?
19 A  Yes. There's recordings.
20 Q  Were those recordings ever shared with
21 anyone else in the -- with anyone else, I guess?
22 A  They were included in the intake packet.
23 The investigator would have had those --
24 Q  Were they shared with Sergeant Tallion?
25 A  No, not to my knowledge.

Page 27

1  Q  Were they -- and they would not have
2  been shared with Ms. Boudreaux either; is that
3  correct?
4  A  If she would have requested a copy of
5  her statement, it would have been provided, but
6  not anyone else involved in the case.
7  Q  Okay. Okay.
8     MS. ROBINS: And just for the record,
9     the city produced the audio with its --
10    initial discovery responses of her audio
11    statement. That was produced I believe
12    back in November.
13    MS. FANSHIER: Yeah. Of Ms. Boudreaux's
14    statement, correct? That's what you're
15    referring to?
16    MS. ROBINS: Yes, yes.
17    MS. FANSHIER: Okay.
18    MS. ROBINS: Her statement to Captain
19    Banks.
20    MS. FANSHIER: But not the other two --
21    MS. ROBINS: The other three? No. The
22    other three were not provided because
23    the investigation was not complete. But
24    we gave her a copy of her own statement
25    to the investigator.

Page 28

1  BY MS. FANSHIER:
2  Q  Okay. Are you aware, Captain Banks, of
3  who Ms. Boudreaux's supervisors were after this
4  incident occurred?
5  A  No, ma'am. I believe she was still in
6  the APR unit with Sergeant Dennis Laurie.
7  Q  Okay. Are you aware of any messages
8  between -- I'm sorry -- sergeant Dennis Laurie?
9  A  Yes.
10 Q  Of any messages between Sergeant Laurie
11 and Ms. Boudreaux about this incident or the
12 complaint?
13 A  No.
14 Q  Okay. And that's the only supervisor
15 figure that you're aware of after --
16 A  Yes.
17 Q  Okay. Thank you. Doesn't make sense.
18 Okay. I think that wraps up everything that I
19 needed to ask you today, Captain Banks. Thank you
20 very much for your time.
21    (Exhibit No. 1 marked.)
22    (Exhibit No. 2 marked.)
23    (Deposition concluded at 3:33 p.m.)
24
25

Page 29

1           WITNESS' ATTESTATION
2
3     I have read or have had the foregoing
4  testimony read to me, pursuant to Rule 30(e) of
5  the Federal Rules of Civil Procedure and/or
6  Article 1445 of the Louisiana Code of Civil
7  Procedure, and hereby attest that, to the best of
8  my ability and understanding, it is a true and
9  correct transcription of my testimony, with the
10 exception of any attached corrections or changes,
11 complete with reasons for changes, on the Witness'
12 Amendment Pages;
13    I have in no way altered the printed
14 transcript pages containing testimony herein,
15 tampered with the seal on the last numbered page
16 herein, or tampered with the security strip on the
17 binder hereof. The integrity of this certified
18 transcript has been maintained in the identical
19 form as it was received by me, with the exception
20 of any changes on the Witness' Amendment Pages.
21
22    _____ Signature_____
       Date           CAPTAIN PRECIOUS BANKS
23
24
25