CITY OF NEW ORLEANS THROUGH LT. JOHN HELOU on 06/27/2022

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4
 5  KIRA GODCHAUX-BOUDREAUX        )   CIVIL ACTION:
         Plaintiff,                )   21-1525
 6                                 )
    vs.                            )   JUDGE: ELDEN
 7                                 )   E. FALLON
    CITY OF NEW ORLEANS            )
 8      Defendant.                 )   SECTION: "L"
    _____
 9
10           CONTINUATION of the 30(b)(6) DEPOSITION
11  OF NOPD through its representative, LIEUTENANT JOHN
12  HELOU, taken on Monday, June 27, 2022 at or about
13  2:00 p.m. via Zoom videoconference.
14
15
16  REPORTER:    KIMBERLY D. EDWARDS, CSR,
                 Certified Court Reporter
17
18
19
    APPEARANCES:
20
    FOR PLAINTIFF:
21           SANGISETTY LAW FIRM, LLC
             3914 Canal Street
22           New Orleans, Louisiana 70119
             (504) 662-1016
23           Kimberly@sangisettylaw.com
             BY: KIMBERLY FANSHIER, ESQUIRE
24
25
```

New Orleans 504.522.2101
Toll Free 800.526.8720

North Shore 985.206.9303
Baton Rouge 225.332.3040



EXHIBIT C

Page 14

1   Q.   They are?
2   A.   Yes. It's a bureau of the New Orleans
3 Police Department.
4   Q.   Okay. And do you have any reason to
5 believe that any employee who was not in the Public
6 Integrity Bureau would or could possibly also have
7 information related to these allegations?
8   A.   I mean, I don't know what kind of
9 communications have gone on outside of the bureau.
10 I mean, I know this happened I believe in the
11 Alternative Police Response unit. So I'm not quite
12 sure what conversations were had in that unit or
13 outside that unit. I really couldn't attest to
14 that.
15   Q.   Okay. It's the -- I'm sorry. I always
16 get this acronym mixed up. The APR unit that you
17 just described, did you make any inquiries within
18 that unit or to that unit to request information
19 about people who might have knowledge of the events
20 or anything about these allegations?
21   A.   I did not.
22   Q.   And did you review any other, anything
23 else regarding the investigation that identified
24 any other individuals?
25   A.   Not to my knowledge, no. Nothing other

Page 15

1 than what I previously stated.
2   Q.   Okay. Have you reviewed or been
3 provided with the documents that the defendant has
4 previously produced in discovery?
5   A.   No, not to my knowledge. I haven't
6 been provided with any of the documents, unless
7 you're referring to something specific that maybe I
8 saw. I'm not sure.
9   Q.   Okay. So have you been made aware of
10 any persons that the defendant has provided in
11 their previous disclosures?
12   A.   I think the complaint, which was
13 anonymous, it mentioned I think two police
14 technicians in the APR unit. But I don't think I
15 know anyone that the plaintiff has specifically
16 named.
17   Q.   You mentioned the two -- so you
18 mentioned the two anonymous complaints in the
19 complaint that we're talking about. Do you know
20 the identity of the people who made those
21 complaints?
22   A.   No. It was an anonymous letter. I
23 believe it listed two police technicians who may
24 have supposedly witnessed the incident, but I
25 couldn't name them to you unless I had the document

Page 16

1 in front of me. I don't recall their names.
2   Q.   So I think actually one of the
3 documents that I wanted to include that might be
4 helpful maybe has those. Let me see if I can
5 introduce it now.
6        Actually, no, never mind.
7        So you do not know the identity of
8 the two -- I'm sorry. Were there two complaints or
9 was there one?
10   A.   It was an anonymous letter I think PIB
11 received. The letter listed two technicians, I
12 think, in the APR unit that supposedly witnessed
13 the interaction with Sergeant Taillon and Officer
14 Godchaux. But I can't tell you the names right off
15 the top of my head without looking at the document.
16   Q.   So I know the complaint was
17 anonymous -- or I'm sorry, that letter was written
18 by an anonymous source, but has the Integrity
19 Bureau's investigation involved finding the
20 identity of the person who wrote that anonymous
21 letter?
22   A.   So the incident is signed by Sergeant
23 Preston. So I'm only the supervisor of the unit.
24 And I just came on in April, like I previously
25 said. So I know that when I came into the unit I

Page 17

1 got a list of all the cases that are still open,
2 and I have been tracking those cases basically to
3 see where they are in the status. I can't tell you
4 about specifics as to what the investigation has
5 uncovered so far.
6   Q.   Okay. But I mean, I would say that the
7 identity of the individual who made the -- who
8 wrote that anonymous letter would be relevant or
9 related here, which is why I ask. But you don't
10 know the identity of that person.
11        Have you, in preparation for this
12 deposition or otherwise, have you engaged in any
13 investigation yourself to find out who wrote that
14 letter?
15   A.   I have not.
16   Q.   Okay. Can you explain -- I guess I'll
17 put it this way. You have provided that list. You
18 listed those names. It was about I think eight or
19 so people. I know it will be in the record. Do
20 you have reason to believe that that is an
21 exhaustive list of the people who have information
22 related to these allegations?
23   A.   In the PIB or the department itself?
24   Q.   In both. In either.
25   A.   Likely the answer is no to both because

Page 18

1 I mean I can't tell you who from PIB may have
2 talked to another PIB person about the case or who
3 may have put eyes on the preliminary investigation
4 document. And then I can't tell you who else in
5 the department may have either first, second, or
6 third-hand knowledge about what happened with the
7 incident involving Sergeant Taillon and Officer
8 Godchaux.
9     Q.   What steps would you take if you wanted
10 to find out any of those people like you just
11 described?
12     A.   Could you maybe rephrase?
13 BY MS. DELARGE:
14     I have to object to this question. I
15     think it's going far afield of the subject
16     area. The subject area is to identify about
17     the plaintiff's allegations, including NOPD's
18     investigation. So I think asking how would
19     you determine if somebody else had knowledge,
20     as we expressed to the Court before, we can't
21     possibly know who plaintiff herself may have
22     talked to and then have second or third-hand.
23 BY MS. FANSHIER:
24     Of course. I understand. I can
25     restate that. But it is reasonable and

Page 19

1 relevant to ask what steps were taken by the
2 deponent to provide the list of individuals
3 with knowledge.
4 BY MS. DELARGE:
5     But you've already asked that.
6 BY MS. FANSHIER:
7     I agree.
8 BY MS. DELARGE:
9     Let me finish. You've already asked
10 him what he looked at and where he got these
11 names from, and he's been very clear in that
12 response as to what documents he looked at
13 and that he saw, or who might be aware of
14 this, whether or not they're in those
15 documents.
16     So I think challenging him that its
17 relevant, in your opinion, to know who the
18 anonymous complainant is, I think it's
19 getting argumentative. It's getting afield
20 from the subject area of identify persons
21 that you know have information relative to
22 NOPD's investigation of this matter.
23 BY MS. FANSHIER:
24     Okay. Well, I agree that that question
25     became repetitive and I believe I've covered

Page 20

1 that already. So I understand.
2 BY MS. FANSHIER:
3     Q.   Okay. So moving on. Are you aware of
4 the second subject area that you are offered as a
5 person who can provide knowledge on -- I'm sorry.
6 That was a bad way of phrasing it.
7     So the second subject area that you
8 were offered as a deponent for is about the
9 existence and location of all documents related to
10 the allegations of sexual harassment, and that was
11 our request. And the defendant's response to the
12 notice provided that you can speak to that request
13 regarding documents created or collected by the
14 Public Integrity Bureau personnel during this
15 investigation.
16     So to shorten that up, were you aware
17 that you were provided to speak about the existence
18 and location of these documents?
19     A.   Yes. As an NOPD witness, yes.
20     Q.   Okay. And how have you prepared to
21 provide information about the location and
22 existence of these documents?
23     A.   So I mean I've been a member of the
24 Public Integrity Bureau, next month will make seven
25 years. So I kind of have an idea, more than a good

Page 21

1 idea about the inner workings of the bureau and
2 where those documents would be kept and could be
3 located.
4     Q.   Okay. So considering that knowledge,
5 that you have the historical knowledge of how the
6 Public Integrity Bureau stores documents, did you
7 make any requests or conduct any investigation to
8 try and retrieve any of those relevant documents?
9     A.   I did not.
10     Q.   And were any documents provided to you
11 to review in preparation?
12     A.   No. They were not.
13     Q.   So regarding the software, and I guess
14 it was a software program, right?
15     A.   You're referring to IAPro?
16     Q.   Yes. So you discussed logging in to
17 that to identify the persons that you named, and
18 then you said there was the initial -- Initiation
19 of a Formal Disciplinary Investigation. You did
20 say you reviewed that document, correct?
21     A.   Yes.
22     Q.   When there is an Initiation of a Formal
23 Disciplinary Investigation, does it usually trigger
24 the creation of more documents?
25     A.   Are you speaking in general?

Page 22

1  BY MS. DELARGE:
2      I don't understand the question because
3  the FDI itself, Formal Disciplinary
4  Investigation is a document. So could you
5  possibly rephrase the question? I'm not sure
6  I understood.
7  BY MS. FANSHIER:
8      Q.  Well, you were just saying you have
9  seven years' experience in the Public Integrity
10 Bureau, and does that include experience with
11 investigations, disciplinary investigations?
12     A.  Yes.
13     Q.  Okay. And in the course of those
14 investigations are there usually documents that are
15 created after the initiation documents? Like I'm
16 guessing like correspondence between people in the
17 bureau discussing the investigation, planning how
18 it might be carried out, recording it, anything
19 like that?
20     A.  So I mean generally speaking, depending
21 on the type of investigation, I mean some of the
22 investigations are public -- come in from the
23 public. Some will come in from the supervisor. So
24 depending on how the investigation is classified,
25 whether it's a public complaint or an internal

Page 23

1  complaint, that depends on what type of
2  corresponding complainant.
3      I mean, every investigation's findings
4  is documented in a final report. So that would be
5  a document that's generated, as well as any
6  exhibits that are referenced in that investigation
7  would be attached to that report. But again, each
8  is different depending on the nature and the scope
9  of the investigation.
10     So there are some standard forms that
11 would be generated, but others would just depend on
12 that investigation, just general, speaking from a
13 general perspective.
14     Q.  Okay. So has there been a final report
15 in this investigation?
16     A.  Not as of yet. It still hasn't been
17 submitted yet. Or completed.
18     Q.  Okay. So are you aware of any e-mails
19 between either members of the bureau or people
20 involved in the investigation that are related to
21 the investigation?
22     BY MS. DELARGE:
23     I'm sorry. I'm not sure I understood
24 that. Did you say who those e-mails are
25 between? You said e-mails between the bureau

Page 24

1  and who else?
2  BY MS. FANSHIER:
3      Yeah.
4  BY MS. FANSHIER:
5      Q.  So are you aware of any e-mails between
6  anyone conducting the investigation and the team
7  they're working with as they conduct the
8  investigation?
9      A.  So since I've been in the criminal
10 section I think I've gotten maybe three or four
11 e-mails from the investigator, Sergeant Preston,
12 that were addressed either/or to Sergeant Hunt
13 regarding this case.
14     Q.  Okay. You said there were three or
15 four?
16     A.  I believe three or four.
17     Q.  Are those e-mails in the same file
18 location that you have been discussing?
19     A.  No. These I've received like within
20 the past month or so. So no, it wouldn't be in the
21 initial Initiation of the Formal Disciplinary
22 Investigation.
23     Q.  Would they end up being stored
24 somewhere or recorded?
25     A.  I mean, they're in the e-mails, but I

Page 25

1  don't think they would necessarily be part of the
2  final investigative product.
3      Q.  Okay. So they wouldn't be attached to,
4  say, this particular investigation record?
5      A.  No. I don't believe so.
6      Q.  Do you have -- so those are the e-mails
7  that you've received. Besides the ones that you've
8  personally received are you aware of any other
9  e-mails related to this investigation that haven't
10 been addressed to you but that have been sent
11 between other members of the bureau or maybe before
12 your term began?
13     A.  I'm aware of one other e-mail. I think
14 it was addressed possibly to Sergeant Preston from
15 Sergeant Hunt. And I believe Lieutenant Darryl
16 Watson was carbon copied on it. And that was
17 basically informing Sergeant Preston of the case
18 against Stephanie, that Sergeant Taillon now had a
19 criminal allegation associated with it and it was
20 being reassigned to her from Sergeant Trinell
21 Franklin.
22     Q.  Okay. So did you conduct any
23 investigation to find those e-mails or were you
24 aware of those previously just because you've come
25 across them in your work?

Page 26

1    A.   I think the first time I saw it was in
2  a meeting with Elizabeth during the preparation for
3  the deposition. I hadn't seen it previously.
4    Q.   Okay. So you said that this
5  investigation has not yet been -- has not yet
6  concluded. So have there been any -- has the
7  Public Integrity Bureau provided any updates or
8  correspondence or information to the people who are
9  involved in the investigation about its status or
10 the course of -- [Technical difficulty/audio
11 glitch.]
12   A.   I'm sorry. You cut out. Did you say
13 something after that?
14   Q.   Sorry. So has there been any
15 correspondence from the Public Integrity Bureau to
16 the persons involved in the investigation about its
17 progress or status?
18   A.   So I'm aware that on -- I can't tell
19 you the date. At the very beginning of June this
20 year Sergeant Preston e-mailed me what's called a
21 Form 308 which is the notice to the accused of the
22 completed investigation and the note of
23 disciplinary hearing. It basically outlined
24 Sergeant Preston's recommended dispositions for the
25 allegations lodged against Sergeant Taillon during

Page 27

1  the investigation. And she also e-mailed a copy of
2  Sergeant Taillon's transcribed administrative
3  statement.
4         And in the e-mail -- well, I don't know
5  if she e-mailed the request or if she told me over
6  the phone, but she asked me to issue the notice and
7  have her sign or transcribe the statement of
8  Sergeant Taillon and then get that back to her so
9  she could include that in her file report.
10   Q.  So where is this Form 308 and
11 transcribed administrative statement stored now?
12   A.   So it was scanned and e-mailed back to
13 Sergeant Preston to include as an exhibit with her
14 final report, final submitted report in the
15 investigation.
16   Q.  So since that final report has not been
17 completed yet, where are those forms now?
18   A.   I mean, I imagine it's either stored
19 digitally in Sergeant Preston's e-mail or she's
20 printed it out and it's in an exhibit awaiting to
21 be attached to the final report.
22   Q.  So it doesn't go into the file or the
23 record of this investigation until it's part of the
24 final report?
25   A.   Yeah. So what happens is once Sergeant

Page 28

1  Preston submits the final report, it's going to be
2  in a folder of the investigation. One side is
3  going to have the exhibits. Once the investigation
4  is approved through Sergeant Preston's chain of
5  command, the whole case will be scanned and
6  uploaded into IAPro.
7    Q.   Okay.
8    A.   That's the investigative report. That
9  will be any audio recordings of any statements and
10 any scanned exhibits. Other documents that were
11 exhibits in that investigation. They will all be
12 uploaded into IAPro. And then you will have the
13 physical case file that will be -- once the case is
14 completed as far as any possible disciplinary
15 hearings or anything, it will be stored in the
16 locked records room at the office.
17   Q.   Okay. So besides the couple of
18 specific documents you just mentioned, do you know
19 of any other documents for this investigation that
20 are in this kind of in between space where they
21 have been maybe scanned in to one person's computer
22 or noted but they haven't been compiled into a
23 final report yet?
24   A.   So today I received from Sergeant
25 Preston a draft copy of her final report, and I'm

Page 29

1  currently reviewing that report for the necessary
2  corrections.
3    Q.   Okay. So could you search for --
4  sorry. Excuse me. I started talking before I was
5  done forming a thought.
6         You have mentioned, is it Sergeant
7  Preston?
8    A.   Yes, Sergeant Preston.
9    Q.   Is that Candice Preston?
10   A.   Yes, Sergeant Candice Preston.
11   Q.   Okay. Besides Sergeant Preston's
12 digital files is there anyone else in the
13 department who might have related documents on
14 their file systems or devices?
15   A.   Not that I'm aware of.
16   Q.   It would all go through Sergeant
17 Preston?
18   A.   I mean, Sergeant Preston is the lead
19 investigator.
20   Q.   Okay.
21   A.   So all of the documents would be turned
22 in with her final report. Now, I know there was a
23 separate criminal investigation by the NOPD's
24 special victims section that Sergeant Denise Wiltz
25 had handled separate. There may be some related